THE ÆTNA MILL AND ELEVATOR COMPANY, *Appellant*,
v. THE KRAMER MILLING COMPANY, *Appellee*.

No. 16,570.

SYLLABUS BY THE COURT.

TRADE-MARKS—*Right to Use of One's Own Name*. A person will not be prohibited from using his own name upon marks or brands placed upon articles of his own manufacture merely because it has first been rightfully used by another, who has established the reputation of, and built up trade in, like articles by the use of the same name in a trade-mark, sign or label thereon; but such person will not be permitted ·by any artifice or device, or otherwise, to induce the belief of customers or others desiring to purchase that the articles so marked are the products of the other.

Appeal from Harper district court; PRESTON B. GILLETT, judge. Opinion filed June 11, 1910. Reversed.

*W. P. Hackney, J. T. Lafferty*, and *Ed T. Hackney*, for the appellant.

*Fred Washbon*, and *E. C. Wilcox*, for the appellee.

The opinion of the court was delivered by

BENSON, J.: The petition in this case alleged that prior to January 1, 1905, J. E. Kramer and S. P. Kramer had owned and operated the Ætna mills at Wellington, under the name of Kramer Brothers,

and manufactured there several high grades of flour, which were extensively advertised, and the brands thereof had become generally known over this country and Europe and the reputation thereof was such that a ready sale was obtainable therefor; that in establishing this reputation the name "Kramer" or "Kramer Brothers," coupled with the grades to which they were attached, became a distinguishing mark, whereby any flour having such names met with ready sale; that on the date named Kramer Brothers sold their business to the plaintiff by bill of sale, describing the property, with this addition: "also our flour brands, trade-signs, mottoes, and the full and entire good will of our business"; that "Kramer's High Patent" is one of the trade-marks and brands so bought by the plaintiff, and a copy of that brand as used on flour sacks is shown by "Exhibit B," attached to the petition (other brands are referred to and shown in other exhibits); that the plaintiff, after such purchase and after it had registered such brands and trade-marks, continued to manufacture and sell these brands of flour, and the commodities so designated have acquired a great reputation, are well known to the public and to buyers by such names and trade-marks, and the business is a source of great profit to the plaintiff; and that in June, 1905, J. E. Kramer and S. P. Kramer, the former "Kramer Brothers," organized the defendant company, purchased mills at Anthony, and proceeded to manufacture flour. The following allegation is then made:

"The plaintiff further avers that the defendant, well knowing the plaintiff's rights in and to all said brands and trade-marks so purchased and owned by it as aforesaid, since the month of July, 1905, in disregard of the plaintiff's rights, makes and offers for sale and sells, and still makes and sells, a similar article, an imitation of plaintiff's said articles of flour and meal, well knowing that the same is an imitation of the plaintiff's said

Mill Co. v. Kramer.

flour and meal, and well knowing of the rights of the plaintiff to the trade-marks and brands as aforesaid, which it puts up, similar to that of the plaintiff, and has labeled with plaintiff's said trade-mark and brand and with labels similar to that of plaintiff, using the word "KRAMER," which marks and brands so used by the defendant to deceive the public as aforesaid are attached to the original petition on file herein, marked "Exhibit K" and "L," and the same are here referred to and made a part of this amended petition; that said imitation was calculated to deceive and does deceive buyers of said article and the public, and has induced many persons to purchase defendant's article in the belief that it was made by the plaintiff, thereby greatly diminishing plaintiff's profits."

Allegations of damages and averments appropriate for an injunction follow, with a prayer for relief accordingly. A demurrer was sustained to the petition, and the plaintiff appeals.

The following is the inscription upon one of the brands so sold, as shown by "Exhibit B":

ÆTNA
PLANSIFTER
MILLS

[Picture of Mill]

KRAMER'S
HIGH PATENT

KRAMER BROS.,
WELLINGTON, KAN.

24 lbs.    KRAMER'S
HIGH PATENT    Flour.

Exhibits "K" and "L" are inscriptions upon packages of flour made by the defendant company which it is alleged are used in violation of the plaintiff's rights.

Mill Co. v. Kramer.

Upon one side of the sack is the mark, or brand, designated as "Exhibit K," as follows:

KRAMER'S

CHANCELLOR.

HIGHEST PATENT.

KRAMER MILLING COMPANY.

ANTHONY, KANSAS.

49 lbs. CHANCELLOR HIGHEST PATENT Flour.

The word "Chancellor" is in large display letters in white, upon a blue band, printed diagonally across a red shield. This symbol and the word "Kramer's" above it in large letters are the most prominent features of the brand. On the reverse side of the sack is the inscription or brand marked "Exhibit L," as follows:

THIS IS THE GENUINE
"KRAMER'S" FLOUR.
Every sack guaranteed.
IF
This Sack Does Not Give Perfect
Satisfaction Bring It Back
And Get Your Money.

The words in the first and second line are the most conspicuous feature in this inscription.

The petition states facts sufficient to constitute a cause of action, unless from the exhibits which show precisely the marks and brands complained of it appears that their use by the defendant is not a breach of any duty or obligation on its part. The exact question then is whether the exhibits "K" and "L" are brands that the defendant can not lawfully use after having

made the sale to the plaintiff of the mill, good will of the business, flour brands and trade-signs.

It will be noticed that apart from the words "Kramer's" and "Highest Patent" there is little in "Exhibit K" that resembles the "Kramer's High Patent" label or trade-mark. The word "Chancellor" in display letters upon a red shield is entirely dissimilar from anything appearing upon the brand sold to the plaintiff. On the other side of the sack, however, is the inscription, marked "Exhibit L," "This is the genuine 'Kramer's' flour," in conspicuous letters, the words " 'Kramer's' flour" being displayed in red in a manner that would at once attract notice. The prominent word "Kramer's" is made more significant and challenges greater attention by being placed in quotation marks. Why was this done if the word was innocently used as pertaining to the defendant's corporate name only? These matters, in connection with the inscription "Kramer's Highest Patent" on the other side of the sack, might well indicate to a purchaser desiring to buy that the sack contained the well-known product of the Ætna mills, sold under the brand of "Kramer's High Patent," shown in "Exhibit B."

The discussion in the briefs has taken a wide range, covering cases of piracy, so-called, in the wrongful use of trade-marks, and of unfair competition in the wrongful use of labels, wrappers, packages, etc., which, although analogous, still differ from the technical trade-marks. The principles that govern these different subjects are similar, however, and for the purposes of this discussion need not be precisely distinguished. The plaintiff clearly had the right to purchase the labels in question, and acquired by such purchase, in connection with the establishment and its good will, the legal rights of the Kramers to use them before the sale, and must be protected to the same extent that they might have been.

Mr. Justice Field said, in *Kidd v. Johnson,* 100 U. S. 617:

"When the trade-mark is affixed to articles manufactured at a particular establishment and acquires a special reputation in connection with the place of manufacture, and that establishment is transferred either by contract or operation of law to others, the right to the use of the trade-mark may be lawfully transferred with it."    (Page 620.)

In *Brown Chemical Co. v. Meyer,* 139 U. S. 540, it was said:

"There are a few cases indicating that the mere right to use a name is not assignable, notably *Chadwick v. Covell,* 151 Mass. 190, but none that it may not be assigned to an outgoing partner or to a successor in business as an incident to its good will."    (Page 548.)

In *Ball v. Broadway Bazaar,* 194 N. Y. 429, the rights incident to trade-marks and analogous rights in trade names were discussed.   The court said:

"Although we agree with the learned appellate division in recognizing the technical distinction. between trade-marks and trade names, we think the same fundamental principles of law and equity are applicable to both.  'All such cases, whether of trade-mark or trade name, or other unfair use of another's reputation, are concerned with an injurious attack upon the good will of a rival business; customers are diverted from one trader to another, and orders intended for one find their way to the other.'  (Seb. L. of Trade-marks, p. 17.) Trade-marks and trade names are in reality analogous to the good will of the business to which they appertain. The trade-mark represents it in the market and the trade name proclaims it to those who pass the shop.   In either case such unfair conduct as is calculated to deceive the public into believing that the business of the wrongdoer is the business of him whose name, sign or mark is simulated or appropriated constitutes the gist of the offense."    (Page 435.)

A manufacturer who, to designate his goods, has adopted a name or device not subject to appropriation as a trade-mark may still be protected in its use from

Mill Co. v. Kramer.

unfair competition if the circumstances warrant it. (*Wolf Bros. & Co. v. Hamilton-Brown Shoe Co.*, 91 C. C. A. 363. In *The J. G. Mattingly Co. v. Mattingly, &c.*, 96 Ky. 430, it was held that the brand "J. G. Mattingly & Sons, Standard Bourbon, Est. 1845, Louisville, Ky.," and another brand with the words "Pure Rye" instead of "Standard Bourbon," might be lawfully sold and transferred with the establishment, and its use thereafter by one of the vendors of the same surname was restrained. The court said:

"That their intention was by some device, if not by actual use of the trade name of J. G. Mattingly & Sons, to induce belief that the whisky they contracted for had been made at the distillery in question and according to the formula long used there, and thus defraud and injure plaintiff, is shown by a letter B. D. Mattingly, April 21, 1890, wrote to Jones, Munday & Co., in which he proposed a secret contract for manufacture on joint account of whisky having the Mattingly brand on it. In that letter is this significant language: 'We can use all the Mattingly thunder we want, save the exact brands.' " (Page 438.)

In a leading case on this subject the court of appeals of New York held that the right of a person to use his own name in business notwithstanding the prior use of the name by others does not extend to a corporation of which he is a promoter and member. The court said:

"Whether the court will interfere in a particular case must depend upon circumstances—the identity or similarity of the names; the identity of the business of the respective corporations; how far the name is a true description of the kind and quality of the articles manufactured or the business carried on; the extent of the confusion which may be created or apprehended; and other circumstances which might justly influence the judgment of the judge in granting or withholding the remedy." (*H. Co. v. H. S. Co.*, 144 N. Y. 462, 469.)

One may not, in the use even of his own name in connection with a manufactured article, to promote its sale, resort to any artifice to mislead the public, and

thereby induce a belief that the article is the one manu-
factured by another which has become known to the
trade by the particular mark or brand. (*Singer M'f'g
Co. v. June M'f'g Co.,* 163 U. S. 169.)    In *Russia Ce-
ment Co. v. LePage,* 147 Mass. 206, the imitation by one
manufacturer of the trade-mark of another, by the use
of the same surname as a prefix, was considered.    Le-
Page, the defendant in that action, and another had
been engaged in the manufacture of glue known as "Le-
Page's Liquid Glue."    They used that mark upon cases
.and bottles, the word "LePage" being the prominent
feature.    They sold out the business, including the
trade-marks, to the Russia Cement Company, a cor-
poration, which thereafter advertised the article ex-
tensively under the trade-mark or name of "LePage's."
LePage then commenced to manufacture and sell a
glue under the name "LePage's Improved Liquid Glue,"
and described its manufacture as carried on under the
management of William N. LePage, the original in-
ventor and manufacturer of "LePage's Liquid Glue."
The court said:

"A person can not make a trade-mark of his own
name, and thus debar another having the same name
from using it in his business, if he does so honestly,
and without any intention to appropriate wrongfully
the good will of a business already established by others
of the name.    Every one has the absolute right to use
his own name honestly in his own business for the pur-
pose of advertising it, even though he may thereby in-
cidentally interfere with and injure the business of
another having the same name.    In such case the incon-
venience or loss to which those having a common right
to it are subjected is *damnum absque injuria.*    But
although he may thus use his name, he can not resort to
any artifice or do any act calculated to mislead the
public as to the identity of the business firm or es-
tablishment, or of the article produced by them, and
thus produce injury to the other beyond that which re-
sults from the similarity of name. . . .    One who
has carried on a business under a trade name, and sold
a particular article in such a manner, by the use of his

name as a trade-mark or a trade name, as to cause the business or the article to become known or established in favor under such name, may sell or assign such trade name or trade-mark when he sells the business or manufacture, and by such sale or assignment conclude himself from the further use of it in a similar way." (Pages 208, 209.)

This language was quoted with approval in *Howe Scale Co. v. Wyckoff, Seamans, &c.,* 198 U. S. 118, 136. Other cases involving the transfer of trade-marks, labels, etc., and the rights of vendor and vendee, are collated and discussed in subject notes in 1 L. R. A., n. s., 704, 20 C. C. A. 165, and 30 C. C. A. 376.

There may be relief against others than the vendors, however, in cases of unfair competition by the use of trade-marks, signs and labels. The Sheffield-King Milling Company, a manufacturer of flour in Minnesota, designated the flour made at its mill by various brands, among which were "Sheffield's Best" and "Gold Mine." Its flour was generally known as Sheffield's flour, and the name "Sheffield" was used as part of its trade-marks, trade names and brands, and the name became generally known in the flour trade. Afterward B. B. Sheffield, with others, organized a corporation named the Sheffield Mill & Elevator Company, and proceeded to solicit business from the customers of the Sheffield-King company, representing that it was a successor thereto and making other false representations. B. B. Sheffield was the son of the founder of the business of the Sheffield-King company. In an action by the last-named company against the new company to restrain the latter from this unfair competition in trade, the supreme court of Minnesota sustained an injunction against the new company restraining it, among other things, from using as a trade-mark or trade name or as a part thereof the word "Sheffield," and from representing itself as a successor to the business of the first company. The court said:

"It is apparent that an effort was made by the de-

fendant so to name itself that the business built up by the plaintiff's predecessor, the Sheffield Milling Company, might be attracted by the name 'Sheffield'; that the name of the defendant was fraudulently selected by it for that purpose, and for the purpose of diverting the business of the plaintiff to itself; and, further, that the defendant has been guilty of unfair competition in business with plaintiff. . . . The intent of the promoters, officers and agents of the defendant in adopting and using the name 'Sheffield,' in connection with the business of manufacturing and marketing flour by the defendant, may be inferred from their acts and the circumstances connected with the incorporation of the defendant and the conduct of its business. It clearly appears from the evidence that the name 'Sheffield,' by long use, became and is a valuable trade name, descriptive of the flour made by the plaintiff, and signifies to the commercial world a desirable grade of flour, and, further, that the right to use the name in such connection was sold to the plaintiff by the promoters of the defendant. Upon the evidence in this case, much of which is not disputed, it seems difficult to explain the acts and conduct of the defendant's officers and agents, except upon the theory that they intended the necessary consequences thereof, which were unfairly to deprive the plaintiff of that which it had honestly acquired and paid a fair consideration therefor." (*Sheffield-King Milling Co. v. Sheffield Mill & Ele. Co.*, 105 Minn. 315, 319, 320.)

The same result was reached in the case of *Walter Baker & Co. v. Slack*, 65 C. C. A. 138. Walter Baker & Co. were the manufacturers of "Baker's Cocoa" and "Baker's Chocolate," articles so marked and known and extensively advertised and sold. Other marks and symbols were upon the labels, in connection with these names. Thus the name "Baker's" became associated in the minds of dealers and associates with the product of Walter Baker & Co. Years after the business had been so carried on, William Henry Baker began, in another state, to make and put upon the market chocolate and cocoa products, so labeled as to cause them to be sold and accepted as the goods of Walter Baker & Co.

Mill Co. v. Kramer.

He was enjoined, and obeyed the decree.   Two of the labels of the goods of the party enjoined were "Baker's Best Cocoa," and "Baker's Premium Best Cooking Chocolate," and were sold by a grocer who was made a party to the suit.   This party being also enjoined, appealed.   Upon that appeal the court said:

"It must not, however, be overlooked that the word 'Baker,' as applied to chocolate and cocoa manufactured by the appellant, had in the course of years come to represent to purchasers the product of Walter Baker & Co., and was so generally known to the trade.   The appellee had largely dealt in those products, and was well informed of those facts, prior to the time when he undertook the sale of the product of William Henry Baker's manufacture.   It must also not be overlooked that William Henry Baker instituted his business and applied the name of 'Baker' to his products fraudulently, with the expectation of profiting by the trade name of 'Baker,' and in the hope of diverting to himself some part of the trade which legitimately belonged to Walter Baker & Co., Limited.   We must therefore deal with the conduct of the appellee in the marketing of this product of William Henry Baker in the light of these circumstances.   He had the right, as we assume, to sell that product, but honesty and good faith required that he should not palm it off as the product of Walter Baker & Co.; that he should not represent it as 'Baker's Chocolate' or 'Baker's Cocoa,' for that meant to the purchaser that it was the product of Walter Baker & Co., Limited."   (Page 141.)

It was held in *White, Appellant, v. Trowbridge*, 216 Pa. St. 11, that a retiring partner, who had not entered into any contract restricting him from using trade-marks of the firm, should not be enjoined from afterward using trade-marks and labels which were not so similar as to deceive persons of ordinary intelligence using ordinary care.   The court approved the following conclusion of the trial court:

"The defendant is not deprived of the right to use his own name in connection with the conduct of his business simply from the fact that his surname is a

44—82 KAN.

portion of the trade-mark used by the copartnership of which he was formerly a member, and whose business has been continued by plaintiffs." (Page 20.)

But the court also approved the following:

" He has no right to use said name for the purpose of misleading the public or to induce persons to deal with him in the belief that they are dealing with or acquiring the product of the old firm, or its successors in business." (Page 20.)

In an extended note in 20 C. C. A. 165, upon unfair competition in trade, which reviews many authorities, it is said:

"The principle which governs in the case to which this note is appended is one which has long been recognized in the courts both of this country and of England. Stated in brief, and in its most comprehensive form, it is that no man has a right to pass off his goods upon the public as and for the goods of another, and thereby work a fraud upon both the public and his rival in trade. This principle is broader than the rules applicable to strict, technical trade-marks, but it is not something separate and apart from trade-mark law. Rather, it may be said, it lies at the very foundation of trade-mark law, and covers, besides, a large field to which some of the technical trade-mark rules do not extend. . . . Independently of the existence of any technical trade-mark, no manufacturer or vendor will be permitted to so dress up his goods, by the use of names, marks, letters, labels, or wrappers, or by the adoption of any style, form, or color of packages, or by the combination of any or all of these indicia, as to cause purchasers to be deceived into buying his goods as and for the goods of another." (Pages 165, 167.)

The defendant company should not be prevented from a just and proper use of its corporate name, although embracing the surname of the Kramers, former proprietors of the Ætna mills; but in such use the defendant can not be allowed, by any artifice or device, or otherwise, to induce customers of the plaintiff or others who may desire to purchase the plaintiff's products to deal with it upon the supposition that they are

dealing with, or buying the wares of, the plaintiff. (*Shoe Co.. v. Shoe Co.*, 100 Maine, 461; *Regent Shoe Mfg. Co. v. Haaker*, 75 Neb. 426; *Nolan Bros. Shoe Co. v. Nolan*, 131 Cal. 271; *Goodyear Co. v. Goodyear Rubber Co.*, 128 U. S. 598; *N. K. Fairbank Co. v. Luckel, King & Cake Soap Co.*, 42 C. C. A. 376; *Donnell v. Herring-Hall-Marvin Safe Co.*, 208 U. S. 267.)

The court can not say as a matter of law that the use of the labels shown in exhibits "K" and "L" were such that persons of ordinary intelligence, exercising usual care, would not be misled into the supposition that the flour was that produced by the plaintiff. The petition presented questions of fact whether the brands, labels and methods used by the defendant resulted in unfair competition within the principles stated in this opinion, and therefore stated a cause of action.

The judgment is reversed, with directions to overrule the demurrer and proceed with the cause.